# Supreme Court of Texas

No. 21-1035

Ammonite Oil & Gas Corporation,

*Petitioner*,

v.

Railroad Commission of Texas and EOG Resources, Inc.,

*Respondents*

On Petition for Review from the
Court of Appeals for the Fourth District of Texas

JUSTICE YOUNG, joined by Justice Busby, dissenting.

The Mineral Interest Pooling Act deprives the Railroad Commission of authority to consider a forced-pooling application unless the applicant first made "a fair and reasonable offer to pool voluntarily." Tex. Nat. Res. Code § 102.013(b). What constitutes a "fair and reasonable offer" is therefore important to Texas law. In my view, that issue is what warranted granting Ammonite's petition for review—specifically, whether the court of appeals erred when it decided that Ammonite's voluntary-pooling offers were unfair and unreasonable because they included a 10% risk-penalty term (or, as that court called it, a "charge for risk"). The Court unanimously rejects the court of appeals' conclusion. Because that court mistakenly thought that the fair-and-reasonable-offer point

resolved the case, it did not proceed to review the Commission's denial of Ammonite's applications on their merits under § 102.011 of the Act. Rather than be the *first* court to consider the applications' merits, we should reverse and remand so that the court of appeals may do so.

Instead, the Court affirms the court of appeals' judgment under both § 102.013(b) and, separately, under § 102.011—in both instances for reasons that the court of appeals never considered and, unfortunately, for reasons that are also wrong. The Court, embracing what it believes is the Commission's view, says that Ammonite's failure to show "drainage" rendered its voluntary-pooling offers unfair and unreasonable. Worse yet, the Court holds that the same fact—no drainage—also supports the Commission's determination that forced pooling is not even an *option* under § 102.011.

Even if I thought it were proper to proceed to the legal questions that the Court addresses, I would disagree with its approach and conclusion for two principal reasons. First, the presence of drainage is not dispositive of whether Ammonite made fair and reasonable voluntary-pooling offers under § 102.013(b). It is at most relevant, and in this context it is immaterial. Second, while drainage would be dispositive of whether forced pooling could properly protect *correlative rights*, Ammonite requests forced pooling (at least in part, if not wholly) for the distinct § 102.011 "purpose" of "preventing waste"—not of minerals that will be *drained*, but of minerals that will be *stranded*. The Commission and this Court mistakenly treat Ammonite's applications as resting solely on "drainage" and "protecting correlative rights" when it is waste through stranding that matters.

2

So here is my view. As a matter of law, Ammonite *did* make fair and reasonable voluntary-pooling offers under § 102.013(b). If we do not send the case back to the court of appeals, we should remand directly to the Commission so that it can decide whether the forced pooling of Ammonite's mineral interest with EOG's is proper under § 102.011 (an issue the court of appeals did not reach and on which the Commission's explanation was conclusory at best, burdened as it was by a mistaken understanding of the fair-and-reasonable-offer point). The Commission should resolve any relevant and material factual disputes (such as the feasibility of extending or reworking EOG's wells, whether now or in the future) and should exercise whatever discretion the law may give it based on those findings. We should make sure that, when the Commission does so, it does not rely on the erroneous impression that "no drainage" is alone a sound basis to deny the pooling applications. The lack of drainage is the very thing that allegedly makes the minerals here stranded. If they are stranded, they constitute waste. And if there is waste, then pooling is on the table and is sometimes mandatory. Drainage is not and never has been required to establish "waste."

But the Court should not, as it unfortunately does, decide the § 102.011 issue in the first instance and purport to defer to the agency when doing so. First, there is nothing for the Court to decide under § 102.011 because its § 102.013(b) holding (with which I disagree) disposes of the case. Second, even so, there is nothing yet to which the Court can defer under § 102.011 because the Commission did not articulate why it could not order forced pooling to prevent wasting Ammonite's stranded minerals. Texas administrative law requires

3

sufficient explanations of administrative actions before courts can uphold them. This requirement, which ensures that agencies' actions are always based on the law and the facts, protects both the agencies themselves and the regulated public.

In other words, "upholding" a Commission order on grounds that the Commission never explained and may not even agree with hardly reflects deference. If a hypothetical agency denies a permit because it thinks that the law requires denial, for example, the denial might actually be reluctant—the agency may well think that granting the permit would be good policy. When freed from the legal misimpressions that burdened this administrative proceeding, the Commission might reach a different outcome—or perhaps the same outcome, but for wholly different reasons, which a court may then review.

A court likewise does no favor to the hypothetical agency by saying "the law does *not* actually require denial of the permit in the way the agency thought, but since the agency reached that result, albeit for mistaken reasons, we have imagined a few other reasons that would support that result, and so we uphold the denial of the permit. Case closed." The one thing courts may never assume is that an agency is hell-bent on a particular *result*, whether the law and the facts allow it or not. Insisting on actual reasons is how courts help prevent even the perception of such a mentality—a mentality that would be arbitrary and capricious and thus impermissible for an agency whose actions must be rational and reasoned.

With respect, therefore, I must dissent.

# I

Many points in the Court's opinion are correct. The Court accurately states that "'[s]tranded' minerals are those that cannot be extracted from a tract with *usual* production methods due to the tract's size, configuration, and location." *Ante* at 3 (emphasis added). The narrow, meandering riverbeds at issue here resemble such tracts, the minerals beneath which are owned by the State—in this case, "the oil and gas beneath a winding stretch of the Frio River . . . some 30 feet wide and 7 miles long, about 21 acres in all." *Id.* at 6. The lack of pooling gives EOG no incentive to attempt to produce the minerals under the river, and the Court correctly observes that pooling "incentivizes drilling that does not leave the State's minerals stranded." *Id.* at 3. The Court also recognizes that another prerequisite for pooling is that an interest owner within the proposed pool (here, EOG) "*has drilled* or has proposed to drill a well" in the unit. *Id.* at 5 (emphasis added) (quoting Tex. Nat. Res. Code § 102.011).

The Court correctly observes that Ammonite began its efforts to negotiate with EOG once "EOG had permits for, and was somewhere in the process of drilling, 16 wells" that went right up to the riverbed but stopped just shy of it on both sides. *Id.* at 6. Likewise, the Court notes that EOG chose to complete those wells as planned, rather than consider extending them just a bit to reach the river, despite Ammonite's pooling efforts. *Id.* at 8 ("By the time of the hearing . . . , each well was completed, and none was draining the riverbed tract."). The Court further agrees that the Commission did not (and in the Court's view had no need to) assess the "hotly contested" question of the wells' "completion status . . .

5

at the time [Ammonite's] offers were made." *Id.* at 18.

This set of agreed premises, in my view, largely supports why it is premature to resolve Ammonite's applications under § 102.013(b). I describe my reasoning in greater detail below, along with the points on which I disagree with the Court.

## A

The Commission cannot consider forced pooling unless the applicant—here, Ammonite—discharges its statutory obligation to pursue voluntary pooling. Ammonite had to make EOG "a fair and reasonable offer to pool voluntarily" before it could turn to the Commission. Tex. Nat. Res. Code § 102.013(b).[1]

---

[1] Historically, this mandate has triggered "jurisdictional review." *Carson v. R.R. Comm'n*, 669 S.W.2d 315, 316 (Tex. 1984). "If the commission finds that the applicant did not make a qualifying offer, it lacks jurisdiction over the petitioner's application and must dismiss it." *R.R. Comm'n v. Pend Oreille Oil & Gas Co.*, 817 S.W.2d 36, 40 (Tex. 1991) (citing *Carson*, 669 S.W.2d at 318).

Happily, the Court today clarifies that § 102.013(b) is "not a prerequisite to the Commission's jurisdiction." *Ante* at 13. This clarification fits alongside many others in which this Court continually emphasizes that no statute should be regarded as having "jurisdictional" force—in the sense of affecting *authority* and risking collateral attack later—without text that makes that result unmistakably clear, thus putting everyone on notice of it. *See, e.g., Unity Nat'l Bank v. Scroggins*, 671 S.W.3d 677, 679 n.5 (Tex. 2023) (Young, J., concurring in denial of petitions) ("As the U.S. Supreme Court put it recently, even when talking about a *statute*, 'this Court will treat a procedural requirement as jurisdictional only if Congress *clearly* states that it is.'" (quoting *Wilkins v. United States*, 598 U.S. 152, 157 (2023))). Section 102.013(b) prescribes a basis for the Commission to dismiss a forced-pooling application: the applicant's failure to have adequately attempted voluntary pooling by making an adequate offer. The target of the pooling effort can preserve this ground as a basis for a court to set aside a pooling order if the Commission does not dismiss on that ground. But if the target never even contests that prerequisite, an eventual order should not be subject to attack on that basis—and certainly not *collateral*

6

The question is therefore whether Ammonite's offers were so poor that the Commission should not even have considered the forced-pooling applications. I think that, as a matter of law, Ammonite met its minimal burden—at the very least, any failure to do so was not for a reason the Commission expressed. Either way, we should remand.

As a preliminary point, it should seem *unlikely* that Ammonite could not get out of the gate by making sufficient offers. The Court notes that Ammonite has made approximately 150 voluntary-pooling offers across Texas to help develop the State's minerals, and it "has worked out voluntary pooling agreements in all but four cases." *Ante* at 4. Those agreements must generally have been regarded as "fair and reasonable" by the other side of the transaction, given that recourse to the Commission was hardly needed, if ever. Yet despite such a successful record, Ammonite here is accused not only of submitting applications that do not warrant forced pooling, but of having failed even to make adequate prerequisite offers for its applications to be considered on their merits. Possibly—but unlikely, in the same way we might think it possible but unlikely that a batter who could hit 146 straight home runs would then strike out. The Court observes that it is unclear if any of these prior "offers involved horizontal wells incapable of reaching riverbed minerals, like EOG's." *Id.* at 18 n.42. But my point is that Ammonite is at least deeply familiar with the *prerequisites* of the process. So, yes, *maybe* it flubbed making "fair and reasonable" offers here—but, given Ammonite's track record, examining such a contention with skepticism is sensible.

---

attack. I agree with the Court that § 102.013(b) is "merely the first of two hurdles an applicant must clear to obtain a forced-pooling order under MIPA." *Ante* at 13.

7

In my view, Ammonite satisfied § 102.013(b) by making fair and reasonable voluntary-pooling offers to EOG. Each offer was a letter about two pages long and accompanied by a plat depicting the proposed pooling unit. EOG would serve as the operator of any wells within each proposed unit. In return, Ammonite offered to pay its share of the drilling, operation, rework, and plugging costs from its share of potential royalties, plus Ammonite would *self-impose* a 10% risk penalty.[2] Most of the letters conclude by inviting EOG to meet and discuss the offers, presumably to facilitate negotiation. This reflects a "bona fide attempt to reach a contractual agreement." *Id.* at 18 n.41 (quoting *Carson v. R.R. Comm'n*, 669 S.W.2d 315, 318 (Tex. 1984)).

EOG, by contrast, did *not* make a bona fide attempt. Instead, EOG rejected Ammonite's offers out of hand. It conducted no negotiations and made no counteroffers.[3] Although "MIPA does not require a counteroffer, it is a factor to consider in determining whether an offer is fair and

[2] In the oil-and-gas industry, the term "risk penalty" is used interchangeably with terms like "non-consent penalty" or "risk charges." *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 665 (Tex. 2005). As to what a risk penalty is, see *infra* note 4 and accompanying text.

[3] Contrary to the Court's suggestion, *ante* at 18–19, EOG does not portray itself as having "negotiated" with Ammonite about a potential voluntary-pooling agreement. Here is how EOG describes (in its briefing to this Court) its response to Ammonite's offers: "EOG responded to the offer letters through its counsel—rejecting the offers, stating its reasons for rejecting the offers (including citations to relevant case law), and asking for proposed dates for an evidentiary hearing before the Commission on Ammonite's MIPA applications." EOG also acknowledges that it made no counteroffers: "The fact that EOG did not make counteroffers to Ammonite's offers is one factor for the Commission to consider in determining whether an offer is fair and reasonable." (Internal quotation marks omitted.) Nor did the Commission find that EOG negotiated with Ammonite. In short, EOG's response was not "let's talk" but rather "pound sand."

8

reasonable." *R.R. Comm'n v. Pend Oreille Oil & Gas Co.*, 817 S.W.2d 36, 43 (Tex. 1991). This approach is consistent with the statutory text and structure, given that "'[t]he obvious intent of the legislature' in crafting MIPA was 'to encourage voluntary pooling.'" *Ante* at 4 (quoting *Pend Oreille*, 817 S.W.2d at 40). EOG's rejection without a counteroffer suggests, at minimum, that § 102.013(b)'s *threshold* inquiry should be resolved in Ammonite's favor—even if Ammonite ultimately cannot obtain forced pooling.

The Court sees it otherwise, but I am not sure why. It correctly observes that the "Commission did not explain why Ammonite's pooling offers were not fair and reasonable." *Id.* at 14. Why not end there? The unexplained basis of the § 102.013(b) conclusion justifies reversal and remand on this point. *See* Tex. Gov't Code § 2001.174(2)(F) (requiring reversal of agency action that is "arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion"). No less for Texas than federal agencies, courts must "insist that an agency examine the relevant data and articulate a satisfactory explanation for its action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (internal quotation marks omitted).

Nor do any of the Commission's findings plausibly fill this explanatory gap. For its part, the court of appeals concluded that the problem was Ammonite's proposed 10% risk penalty, a conclusion that—although wrong—was at least based on the Commission's express findings. To explain why the court of appeals' rationale is wrong, I briefly discuss what risk penalties are, because they help explain how Ammonite's offers were *more* rather than *less* fair and reasonable.

9

As our sister high court explained it, "[a] 200 percent risk penalty means the nonconsenting owner will relinquish his or her right to receive his or her share of production revenue until the consenting parties recover two times the nonconsenting owner's share of the expenses." *Gadeco, LLC v. Indus. Comm'n of N.D.*, 812 N.W.2d 405, 409 (N.D. 2012). A risk penalty helps "ensure that the economic risk assumed by the operator in drilling and completing a well is reasonably shared by all who stand to benefit." *Ante* at 7. It "is designed to allow reasonable compensation for working interest owners who undertake the risk of developing new wells." *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 665 (Tex. 2005); *see also Application of Kohlman*, 263 N.W.2d 674, 675 (S.D. 1978) (explaining that a "risk penalty" serves to "provide extra compensation from production (if oil is found) to the drilling party").[4]

Even though Ammonite offered this extra compensation, the court of appeals concluded that "there is a reasonable basis for the

---

[4] In discussing the backdrop of its statutory risk-penalty provisions, the North Dakota Supreme Court explained how such penalties make pooling outcomes more reasonable and fair:

> Courts and state governments recognized that it is unfair for a nonconsenting owner or nondriller lessee to be relieved of the costs and risks associated with drilling a producing well, but at the same time reap the benefits of another's efforts in extracting oil or gas from beneath his or her land. In an effort to ensure that nonparticipating owners do not benefit from the successful outcome of risks they do not take, states have authorized penalties typically called a "nonconsent penalty" or "risk penalty" to be imposed on nonconsenting working interest owners as a reasonable way to allocate risks and balance the diverse interests involved in the pooling of oil and gas interests.

*Gadeco,* 812 N.W.2d at 407–08 (internal citations and quotation marks omitted) (discussing N.D. Cent. Code § 38-08-08).

10

Commission's fact finding and conclusion that Ammonite's voluntary pooling offers were not fair and reasonable based on a 10% charge for risk being unreasonably low according to Smith's uncontroverted testimony." 672 S.W.3d 33, 41 (Tex. App.—San Antonio 2021) (referencing Finding No. 8 and EOG's expert witness Tim Smith). As the Court notes today—another point on which we agree—risk penalties are not even required to be offered *at all*, *see ante* at 7 & n.17, and the statute caps the maximum possible risk penalty at 100%, *id.* at 7 & n.16 (quoting Tex. Nat. Res. Code § 102.052(a)). Ten percent was a *starting* offer, and Ammonite made clear that there was room to grow.

Ammonite told EOG all along that it would accept whatever risk penalty the Commission might prescribe, including the 100% statutory maximum. EOG even acknowledges in its briefing to this Court that its own "petroleum engineer expert witness Tim Smith testified that a 100% risk penalty *would be reasonable*."[5] (Emphasis added.) But instead of negotiating for something higher than 10%, or even demanding 100%, EOG refused to negotiate at all. *See supra* note 3.

---

[5] EOG's acknowledgement undermines the Court's assertion that "[a] 100% risk penalty would not have made Ammonite's offers reasonable." *Ante* at 20 n.43. Also undermining the Court's assertion is the hearing examiners' recommendation of a risk penalty half that size: "In order to balance this conflicting evidence and the other factors, it is recommended that a 50% charge for risk based on the facts of this case, is fair and reasonable as is required by § 102.017 of the MIPA." *See also* Tex. Nat. Res. Code § 102.017(a) ("After notice and hearing, all orders effecting the pooling shall be made on terms and conditions that are fair and reasonable and will afford the owner or owners of each tract or interest in the unit the opportunity to produce or receive his fair share."). The hearing examiners are not the Commission, obviously, but my point is that everyone has well understood Ammonite's flexible offer, and the hearing examiners did not even think going past 50% was necessary, so offering even more than that is highly unlikely to be an insufficient offer.

In any event, the Court—again, correctly—observes that "[t]here is no evidence that EOG rejected Ammonite's pooling offers because of the proposed risk penalty." *Ante* at 15. EOG identified two reasons for why Ammonite's offers would be "unreasonable" no matter *what* those terms were: (1) there was no indication EOG's existing wells were draining Ammonite's minerals (*see infra* Part I.C) and (2) EOG's leases otherwise prevented it from accepting *any* voluntary-pooling offers, no matter how fair and reasonable.[6] The court of appeals relied on the supposedly inadequate risk-penalty offer, which the Court today unanimously rejects. *Ante* at 15–16.

## B

The Court could therefore remand to the court of appeals, which has not considered anything beyond its erroneous risk-penalty conclusion. The Court instead stretches to find a basis to sustain the threshold determination that Ammonite failed to make a fair and reasonable offer, and this is where I must part ways with the Court.

The Court expresses the desire to defer to the Commission. I agree that our precedent indeed recognizes the Commission's authority under § 102.013(b): "The commission's application of the statutory term to the facts in each case is conclusive, unless it is unreasonable." *Pend Oreille*, 817 S.W.2d at 42. But the Commission's "application" here is, at best, wholly unexplained and thus unsustainable as a matter of law. Without

---

[6] The Court "assume[s] without deciding" that such a contractual artifice could not avoid forced pooling altogether. *Ante* at 8 n.18. What is to decide? It seems self-evident that if "forced" pooling was off the table merely because a lessor and lessee agreed by contract not to *voluntarily* pool with others, then there would be no such thing as forced pooling—anyone could avoid it at will.

12

knowing anything more than the bottom-line conclusion, it is anyone's guess whether that bottom-line conclusion is "reasonable." The result is conclusory, not "conclusive."

The best way to show why is to start with the Commission's factual findings that are at least plausibly linked to its conclusion that Ammonite's pooling offers were unfair or unreasonable. It made only eleven such findings, which fit on a single page. Five factual findings could (possibly) relate to the "fair and reasonable offer" conclusion:

> 6. Ammonite did not provide survey data or a metes and bounds description of the riverbed to establish the precise acreage to be force pooled into any of the sixteen (16) wells.
>
> 7. None of the sixteen (16) wells produce hydrocarbons from or drain the adjacent riverbed tracts.
>
> 8. At the hearing, Ammonite agreed with a greater charge for risk than the 10% listed in its voluntary pooling offer for each of the sixteen (16) wells if the Commission recommended same.
>
> 9. Formation of the proposed MIPA units for the sixteen (16) existing wells will not access or produce any of the hydrocarbon reserves under Ammonite's adjacent riverbed tracts.
>
> . . . .
>
> 11. Compulsory pooling will not prevent waste, protect Ammonite's correlative rights, or prevent the drilling of unnecessary wells. . . .

I am willing to take these findings as true, but doing so does not support, much less establish, that Ammonite's offers were unfair or unreasonable. Finding No. 8, as I have explained, affirmatively *supports* Ammonite. And Finding No. 6 describes a circumstance (omitting survey data or a metes-and-bounds description) that at most might render

13

Ammonite's offers *unclear* but, absent further explanation, not unfair or unreasonable. I agree with the Court that Finding No. 6 is irrelevant and that Ammonite provided enough information for anyone to discern the pool's exact contours. *See ante* at 14–15.

Three Findings remain: Nos. 7, 9, and 11. They are relevant but are of no greater help to the § 102.013(b) conclusion. Those three findings concern the fact that EOG's wells currently do not produce or "drain" minerals from Ammonite's riverbed acreage. *This* ground is the one that EOG pressed and that the Court today embraces, so I address in greater detail why it cannot do the trick either. According to EOG, the "no drainage" fact means *any* offer from Ammonite would be inherently "unfair and unreasonable" and the Commission could do nothing but dismiss under § 102.013(b). After all, the argument goes, EOG's wells do not drain Ammonite's minerals, so Ammonite would receive payments from EOG's production without contributing to that production (unless EOG extended its wells, at least, because of the lack of drainage).

But the Court is not quite right to describe as "undisputed" that Ammonite's pooling offers would, if accepted, give Ammonite "a share of EOG's production *without Ammonite's contributing any minerals of its own.*" *Ante* at 16 (emphasis added). To the contrary, this assertion *is* disputed. Pooling would authorize EOG to produce Ammonite's riverbed minerals, thereby "de-stranding" them so that they are not wasted. That is the nature of pooling.[7] Any future production from Ammonite's

---

[7] Ammonite explained in its briefing to this Court that pooling "would enable EOG's 'current or future wells to produce from such undrained acreage, both on EOG's acreage and the Frio Riverbed tracts.'" Ammonite added at oral

14

minerals, moreover, would primarily benefit EOG, not Ammonite. All the pools would be proportional to the parties' contributed acreage—as a result, Ammonite's interest in the pooled units would be less than 1% to EOG's 99%. So if Ammonite's minerals were produced, EOG would receive 99% of that production (after benefiting from the potential 100% risk penalty, too). In other words, Ammonite is indeed "contributing . . . minerals of its own" *to the pool*.

EOG cannot dispute—at the § 102.013(b) stage—its ability to produce those minerals (and then keep 99% of them). Some of its key arguments against pooling here have been predicated on the notion that Ammonite's scanty acreage presumably *can* be developed in the future— the minerals are not going anywhere and development is not impossible. Had Ammonite and EOG reached a pooling agreement, or if the Commission had imposed one, then Ammonite says EOG "could have reached and produced" the riverbed and, "[i]n fact, it could still reach and produce those minerals even today." (Emphasis omitted.) EOG claims that the ability to produce the riverbed minerals in the future means there is no real *need* for pooling today. But it also means that if the acreage *is* pooled today, then *EOG* will get the production benefit tomorrow (or whenever it decides to produce). That right surely is a good incentive for EOG to do what it can to develop those minerals, which otherwise are apparently stranded and thus wasted. Forced pooling aims to eliminate such waste. EOG could get the benefit of the pool whenever it wants. Thus, only *for now*, and only for as long as EOG wishes, would

argument, "EOG has the right, once there's pooling, to access those minerals itself."

Ammonite be a net winner (and, even now, Ammonite's winnings could be significantly reduced by the self-imposed risk penalty).

Of course, producing the riverbed—by extending EOG's existing wells or completing new ones to reach the riverbed—*may* turn out to be technologically or commercially impractical. But that is putting the cart before the horse. The Court observes that Ammonite's offer letters did "not mention the possibility of extending any well" into the riverbed, as if the State and Ammonite would pursue pooling and then try to deny access to the pooled minerals. *Ante* at 18.[8] Ammonite did not have to *prove* that it was possible or practical to drill or extend wells into the riverbed to proceed past § 102.013(b).[9] Presumably it was and remains practical and possible, in the same way the Court believes it is practical or possible for Ammonite to drill the riverbed by itself in a future technological or economic climate. *See id.* at 11, 25. In any event, EOG did not reject Ammonite's offers based on impracticability or impossibility. Nor did the Commission make a finding or conclusion on these grounds. Neither should we—and certainly not at this stage.

---

[8] It seems implied that, upon pooling, EOG would have the authority to reach the riverbed either by extending existing wells or drilling new ones. *See also supra* note 7. To the extent this was unclear, the offers were likewise unclear. But lack of clarity would not render them inherently unfair or unreasonable, particularly when no effort to seek clarity was found because no negotiation was undertaken. In any event, it seems unlikely that Ammonite (or its lessor, the State) planned to stop production of the minerals they seek to pool—and if that was their plan, it would seem to be a rather easy basis for the Commission to deny their applications.

[9] The Court references my "share[d] . . . doubt" regarding Ammonite's carrying its "burden of proof." *Ante* at 23 n.50. To be clear, I share that doubt with respect to the second issue regarding § 102.011, not with respect to the first issue regarding § 102.013(b). I discuss the concern in Part II below.

16

## C

"No drainage," in short, does not warrant the dispositive weight that the Court gives it.

The Court does not say that drainage is essential to showing waste, but it does say that the *lack* of drainage is a "critical factor" in determining not just whether Ammonite's applications should succeed under § 102.011, but whether Ammonite's voluntary-pooling offers were fair and reasonable under § 102.013(b). *See id.* at 17 (quoting *R.R. Comm'n v. Broussard*, 755 S.W.2d 951, 953 (Tex. App.—Austin 1988, writ denied)).

As used here, at least, this "no drainage" theory does not truly probe § 102.013(b) inasmuch as it relies on forced-pooling assumptions under § 102.011. It relates to whether, *despite* Ammonite making a fair and reasonable offer, the Commission might nonetheless decline to compel pooling for some other collateral reason. After all, Ammonite's theory is that, without pooling, its riverbed minerals are "stranded" and thus "wasted." If so, Ammonite's pooling applications ought to be addressed under § 102.011, not dismissed under § 102.013(b) for a suspiciously § 102.011-like reason. Otherwise, applications like these suffer from an incurable threshold defect—Ammonite could never invoke the Commission's authority to enter a forced-pooling order under § 102.011 because, as a matter of law, "no drainage" would preclude the existence of a fair and reasonable pooling offer under § 102.013(b). That odd result would be true regardless of the offer's terms, any bona fide attempt at contracting, or whether the wells could be made to drain in the future.

Such an approach improperly shifts § 102.013(b)'s focus away from facts showing whether there is "a fair and reasonable offer to pool

17

voluntarily" (*e.g.*, how the offeror proposes that operation costs and production revenue within the proposed unit be shared) and toward facts showing whether forced pooling is warranted (*e.g.*, facts like "no drainage" and "stranding").[10]  The § 102.011 merits inquiry would subsume the § 102.013(b) threshold inquiry, essentially wiping away the modest opening question that is simply there to ensure that, before the Commission considers pooling, the parties have been incentivized to work together.  Merging the two statutes as the Court does today can only achieve the exact opposite result.

Of course, I do not suggest that "no drainage" is wholly *irrelevant* at the threshold stage.  But it would matter in a way that informs that threshold inquiry without being an automatic bar to proceeding beyond it.  For example, "no drainage" may affect the respective bargaining power of the parties contemplating a voluntary-pooling agreement. *Cf. Carson*, 669 S.W.2d at 318 ("those relevant facts, existing at the time of the offer, which would be considered important by a reasonable person in entering into a voluntary agreement concerning oil and gas properties").  Here, "no drainage" weakens Ammonite's bargaining power by reducing the likelihood that the Commission would grant Ammonite a forced-pooling order under § 102.011.  EOG could legitimately leverage this fact in

---

[10] The *presence* of drainage is a very different matter.  If a well drains from other acreage, that can be probative of whether forced pooling is necessary to protect correlative rights. *See Texaco Producing, Inc. v. Fortson Oil Co.*, 798 S.W.2d 622, 624 (Tex. App.—Austin 1990, no writ) ("A producer who demonstrates that reserves underlying his land are being drained, and that he does not have an opportunity to offset that drainage, establishes injury to correlative rights as a matter of law."), *cited with approval in R.R. Comm'n v. Lone Star Gas Co.*, 844 S.W.2d 679, 683 n.2 (Tex. 1992).  "Stranding," as I discuss below, is probative of whether forced pooling is necessary to prevent waste.

attempting to obtain the best terms or even to reject voluntary pooling—but not to block § 102.011 review automatically. A fair and reasonable offer in this context might factor in any unlikelihood that Ammonite would obtain an eventual forced-pooling order—hence, no doubt, Ammonite's willingness to go up to the statutory maximum for risk penalties.

But by the same token, EOG's leverage would diminish if Ammonite's (or any offeror's) request for pooling has merit—say, because their minerals are "stranded" and thus wasted absent pooling. A reasonable offeree would consider the threat of an eventual government-issued forced-pooling order if the offeree could not negotiate a voluntary-pooling agreement with the offeror.

None of this, however, should be resolved as a prerequisite when a plausible offer is made, particularly when no negotiation ensues. The "no drainage" and "stranding" contentions are merely offsetting facts for § 102.013(b)'s purposes; if a voluntary arrangement proves elusive despite an offer like Ammonite's, the matter should move to the § 102.011 stage.

The Court's primary authority for allowing "no drainage" such weight is a 1988 writ-denied case from the Austin Court of Appeals, *Railroad Commission v. Broussard*. *See ante* at 17–18, 24. The Court emphasizes that *Broussard* "is one of the only published judicial decisions in Texas—maybe the only one—involving comparable facts." *Id.* at 17 n.40. It is cited "to show that the Commission's position here is consistent with the position it took four decades ago." *Id.* Our judicial review does not hinge on whether an agency's "position" is consistent with one it took decades ago. Our priority should be whether the agency properly exercised the discretion the legislature bestowed upon it. It should be

19

alarming that the non-binding *Broussard* is the only authority involving supposedly "comparable" facts that the Court can scavenge from the depths of our dusty law library.

More importantly, the Court's premise is incorrect. *Broussard* does *not* involve "comparable" facts. It involved a "no drainage" fact pattern—not a "no drainage" *and* "stranding" pattern. Unlike here, there it was "*undisputed* that, for the [offeror's] offer to be determined to be fair and reasonable, one of the wells belonging to [offeree] must have been draining gas from under [offeror's] property." *Broussard*, 755 S.W.2d at 953 (emphasis added). But here, Ammonite *concedes* its acreage is not being drained. That is the point: unlike the *Broussard* offeror, Ammonite invokes MIPA to prevent stranding (and thus prevent *waste*), not to remedy drainage (and thus protect *correlative rights*). Those are fundamentally different grounds for ordering forced pooling.

*Broussard* also provides no detail regarding the actual offer terms being scrutinized for their fairness and reasonableness (*e.g.*, risk penalty, cost sharing, etc.). Surely a § 102.013(b) analysis must begin and end with the terms of the offer at issue. In between lies the context: the facts and circumstances of a given case (like "no drainage" and "stranding," or unique geology, or anything else that sets the parties' respective bargaining power), and then the offeror's willingness, or not, to put enticing terms like a substantial risk penalty on the table.[11] Even if *Broussard* were a precedent of *this* Court, I doubt it should play anything like the role it does in the Court's analysis today.

---

[11] The Court, by contrast, ends its analysis with the context of "no drainage" rather than the offers' terms: "we do not end our analysis with the terms of Ammonite's offers." *Ante* at 20. In my view, that approach is wrong.

20

\* \* \*

I would hold that all the Commission's findings—however supported they may be—cannot establish its legal conclusion that Ammonite's pooling offers were unfair or unreasonable under § 102.013(b). Ammonite made offers consistent with MIPA's purpose of encouraging voluntary pooling. Ammonite would pay its fair share of costs plus a self-imposed risk penalty. If this was unsatisfactory, Ammonite was willing to negotiate. EOG rejected Ammonite's offers—without making any counteroffers—on grounds of "no drainage." Rejecting the offers to voluntarily pool was, of course, EOG's prerogative. But as a result, it became Ammonite's prerogative to submit forced-pooling applications for review on their merits under § 102.011.

## II

The Court's (mistaken) holding that Ammonite made no fair and reasonable offers means that the Commission itself could go no further into the merits of those offers, so on its own reasoning, the Court should not reach § 102.011.[12] Indeed, the court of appeals affirmed solely on the first issue regarding § 102.013(b), so (properly, based on its holding) it did

---

[12] Under the Court's own theory that Ammonite did not make a fair and reasonable voluntary-pooling offer, the Court should affirm and say no more. Section 102.013(b) forecloses any basis upon which Ammonite could receive forced pooling absent having made a fair and reasonable voluntary-pooling offer. Yet the Court proceeds to state that "[t]he Commission's conclusion that forced pooling would not prevent waste or protect correlative rights is not unreasonable" under § 102.011—as if the Commission could order forced pooling notwithstanding Ammonite's failure to make a fair and reasonable offer. *Ante* at 25. That implication is incorrect and the Court's statement predicated on it is thus not remotely necessary to its disposition. If I agreed with the Court that Ammonite failed to make a fair and reasonable voluntary-pooling offer, then I would still oppose the Court's decision to make an additional holding under § 102.011.

21

not reach the second issue regarding § 102.011.  On the assumption that *some* court should be examining § 102.011, therefore, the Court could reverse and remand for the court of appeals to do so in the first instance rather than doing so ourselves.  This Court should typically be the *last* court rather than the *first* court to address legal issues.  *See In re Troy S. Poe Tr.*, 646 S.W.3d 771, 780 (Tex. 2022) ("As a court of last resort, it is not our ordinary practice to be the first forum to resolve novel questions, particularly ones of widespread import.").  If we wish to make an exception to the principle that this Court is a court of review, not of first view, we ought to do so only for an urgent reason.  Nothing urgently requires this Court to be the first to resolve issues about this particular refusal to force the pooling of this particular acreage.

Yet the Court marches onward, so I do too.  In doing so, I conclude that the Commission also erred in making its § 102.011 determination.  So if § 102.011 matters (and I do not see how it could matter to the Court if there was no fair and reasonable offer from Ammonite), then we should remand to the agency.  *See* Tex. Gov't Code § 2001.174(2).  The following analysis, in other words, relies on the dubious assumption that addressing § 102.011 is *necessary*.

Section 102.011 mandates forced pooling "for the purpose of . . . preventing waste."  It is undisputed that, at least in theory, stranding minerals can constitute "waste."[13]  The statute, as the Court notes, *ante*

---

[13] At oral argument, EOG's counsel clarified: "Stranding can be waste, absolutely.  Stranding can be waste, but that's not the question for this Court.  The question for this Court is whether the MIPA forced pooling order would prevent that waste."  Similarly, the Commission's counsel stated: "The Railroad Commission understands that stranded minerals can constitute waste."

at 21, defines "waste" to include "loss incident to or resulting from . . . *locating, spacing*, or operating a well or wells in a manner that reduces *or tends to reduce* the total ultimate recovery of oil . . . from any pool," Tex. Nat. Res. Code § 85.046(a)(6) (emphasis added). Stranding minerals so that they remain in place while all the nearby ones are extracted surely can "tend[] to reduce" the "ultimate recovery" of the stranded minerals— it is speculative whether or when they will be recovered. The very act of stranding can make any future recovery far harder.

Recognizing stranded minerals as waste makes sense, given that Texas policy "is to encourage the recovery of minerals." *Key Operating & Equip., Inc. v. Hegar*, 435 S.W.3d 794, 798 (Tex. 2014). Ammonite's minerals appear stranded beneath the riverbed, and thus at least potentially wasted, absent pooling. (Recall, too, that *the State* leased its minerals to Ammonite. *Ante* at 3–4.[14]) EOG's expert Tim Smith testified that it would be impossible for Ammonite to drill a commercially viable, horizontal well *solely within* the riverbed acreage. Ammonite would need at least some access to EOG's adjacent acreage to produce the riverbed.

In concluding that forced pooling would not prevent waste, however, the Commission made no findings or conclusions regarding Ammonite's minerals being "stranded." Instead, its most pertinent

---

[14] I refer to the State here, and below, because today's decision affects it and not just Ammonite. *See ante* at 3 ("The State owns the minerals beneath its more than 80,000 miles of navigable rivers and waterways."). If the law, when accurately stated, disproportionately harms the interests of the State, so be it; no one is seeking special treatment for the State. But the significant interests at issue surely warrant *more* analysis and explanation from the Commission up front and *less* from the Court today, given the posture of the case. Even worse, though, the Court's premature decision is erroneous, and its error unjustifiably leads to adverse consequences mostly on the State.

findings focused on the "no drainage" facts:

> 7. None of the sixteen (16) wells produce hydrocarbons from or drain the adjacent riverbed tracts.
>
> . . . .
>
> 9. Formation of the proposed MIPA units for the sixteen (16) existing wells will not access or produce any of the hydrocarbon reserves under Ammonite's adjacent riverbed tracts.
>
> 10. Ammonite offered no expert witnesses or evidence of drainage areas of any wells.
>
> 11. Compulsory pooling will not prevent waste, protect Ammonite's correlative rights, or prevent the drilling of unnecessary wells. The applicant failed to meet its burden of proof to prove that the granting of the application is necessary to prevent waste, protect correlative rights, or avoid the unnecessary drilling of wells. In the record, there is simply no evidence showing that forced pooling these wells will prevent waste or protect correlative rights – the wells have been drilled and are producing; they do not and will not produce riverbed minerals.

The "no drainage" facts are undisputed and are properly emphasized in the § 102.011 context. Consequently, pooling to protect Ammonite's correlative rights may be unlikely because EOG's operations do not drain Ammonite's minerals. *See supra* note 10. But the "novel question" in this case, *see Troy S. Poe Tr.*, 646 S.W.3d at 780, is whether Ammonite's minerals are "stranded" (everyone seems to agree that they are) and, if so, how that finding would interplay (if at all) with the "no drainage" findings in making the ultimate conclusion on ordering pooling to prevent "waste."

These points remain unresolved and should be remanded to the Commission to provide clarity. Maybe "stranding" would compel a forced-

pooling order in light of the policy favoring mineral recovery (including the State's *own* minerals, which have been leased to Ammonite). Maybe "stranding" would not compel a forced-pooling order, if producing the riverbed minerals is speculative. This Court cannot be sure because the Commission made no findings on whether, for example, EOG could practically extend existing wells or drill new ones to recover the riverbed upon pooling. For a similar reason, I am unpersuaded by the Court's reasoning that forced pooling (a) "could not, at the time the Commission reached its decision, have *prevented* waste" (b) "because, as the Commission's order states, 'the wells have been drilled and are producing; they do not and will not produce riverbed minerals.'" *Ante* at 22.

Just because EOG's wells may "have been drilled" does not bar forced pooling. As the Court acknowledges, § 102.011 expressly contemplates pooling in just this situation—where an owner like EOG "has drilled" (*i.e.*, already) on the proposed unit. *Id.* at 5 (quoting Tex. Nat. Res. Code § 102.011). Nor does the analysis turn on whether the Commission's order would assuredly or without any doubt "*prevent* waste." Section 102.011 authorizes forced pooling "*for the purpose of . . . preventing waste.*" *Id.* (emphasis added) (quoting Tex. Nat. Res. Code § 102.011); *see also* Tex. Nat. Res. Code § 102.017(a) (pooling orders shall afford owners "the opportunity" to produce their fair share). A Commission order might serve the *purpose* of preventing waste if the order could reasonably incentivize producing the riverbed.

The § 102.011 inquiry here should instead focus first on whether Ammonite's minerals are "stranded." If so, then they were (and remain) wasted. "Pooling is one method to prevent waste." *Key Operating*, 435

25

S.W.3d at 798. The next question might be whether, upon pooling, EOG could practicably extend its existing wells (or complete new ones) to recover Ammonite's minerals from the riverbed. Assuming EOG could, then Ammonite's minerals could be produced and would no longer be stranded, with the net effect from a pooling order possibly being that EOG and Ammonite (and by extension, the State and the public fisc) each get increased proceeds from production. In the words of Ammonite's counsel at oral argument: "Huzzah—everybody gets paid."[15]

The Court identifies a fair counterpoint to this hypothetical, namely that "Ammonite, as the MIPA applicant, had the burden of proof to demonstrate to the Commission the technological and economic feasibility of reworking EOG's wells to reach the riverbed." *Ante* at 24. I share the Court's doubt about whether Ammonite carried its burden of proving how its minerals would be produced and de-stranded if the Commission granted forced pooling. I also have doubt, however, about why EOG rushed to complete wells that comply with its leases—*no voluntary pooling allowed!*—rather than proactively work with Ammonite to avoid stranding and wasting the riverbed minerals in the first place. But resolving any such doubts at this point, or even determining *how* to resolve them, is not the answer.

Here is why. The Commission made no findings on whether

---

[15] In full, counsel explained: "Once you pool it, then everybody shares. . . . There is a recovery by the people in the pool. EOG teamed with Ammonite. So, at that point, if you ultimately get recovery, huzzah—everybody gets paid. There's no double recovery by Ammonite. There's increased recovery by everybody, which is what's contemplated." *See also supra* note 7 and accompanying text.

Ammonite proved its minerals were stranded and thus wasted,[16] nor did the Commission say anything about the feasibility of EOG de-stranding the minerals. The Commission found only that "Ammonite offered no expert witnesses or evidence of *drainage* areas of any wells." (Emphasis added.) Omitting any discussion of Ammonite's minerals being stranded is noteworthy given that stranding—not drainage—was the most viable basis for Ammonite's MIPA applications and that there is at least some evidence of stranding.[17]

The omission is "arbitrary" and "capricious" and reflects an "abuse of discretion." *See* Tex. Gov't Code § 2001.174(2)(F).[18] An "agency's decision is arbitrary or results from an abuse of discretion if the agency . . . failed to consider a factor the legislature directs it to consider." *City of El Paso v. Pub. Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994).

---

[16] "In this Court, the Commission assumes Ammonite's minerals are stranded . . . ." *Ante* at 21.

[17] The Court again uses *Broussard* to support the conclusion that dismissal is proper where, as here, no minerals are being drained. *See ante* at 24 (quoting *Broussard*, 755 S.W.2d at 953). *Broussard* deserves no consideration here. It addressed whether there was a fair and reasonable voluntary-pooling offer under § 102.013(b). The court of appeals there did not reach the merits of the forced-pooling application, and there was no argument regarding minerals being "stranded" and thus "wasted" under § 102.011. *See supra* Part I.C (discussing *Broussard*).

[18] The Court focuses exclusively on "substantial evidence" in its two citations of § 2001.174. *See ante* at 5–6 & n.15, 14 & n.31. But § 2001.174 provides for far more scrutiny than that—it expressly directs courts to remand when an agency's "findings, inferences, conclusions, or decisions are" "in violation of a constitutional or statutory provision," "affected by other error of law," or "arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Tex. Gov't Code § 2001.174(2)(A), (D), (F). Suggesting that "substantial evidence" is all that matters is inconsistent with the governing statute. And here, the order must be set aside under § 2001.174(2) for reasons that have nothing to do with "substantial evidence."

The Commission's order fails to consider whether Ammonite's minerals were wasted (because of stranding) and, if so, whether forced pooling could be ordered to prevent their stranding. Instead, the order reflects the Commission's erroneous belief that Ammonite had to prove drainage to obtain pooling, even for the purposes of preventing waste. That belief conflates the relationship between drainage (and protecting correlative rights) with stranding (and preventing waste). *See* Tex. Gov't Code § 2001.174(2)(D). So no matter how supported the Commission's *factual* findings may be, they do not support its *legal* conclusion that forced pooling was improper for purposes of preventing waste under § 102.011.

\* \* \*

I would therefore reverse and remand either to the court of appeals (to consider § 102.011 in the first instance, with attention to "stranding" and "waste") or, if we must address § 102.011 ourselves first, then to the Commission (to reconsider and articulate clearer explanations of its § 102.013(b) and § 102.011 conclusions). It may very well be that, upon further proceedings, Ammonite's MIPA applications would still fall short. But because the Commission's order and the record before us do not yet support that conclusion, I must respectfully dissent.

Evan A. Young
Justice

**OPINION FILED:** June 28, 2024

28